IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DOUGLAS ALFORD, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION No. 1:15-CV-59 |
| v. | § | |
| | § | JUDGE RON CLARK |
| ACCESS INDUSTRIES, INC., et al., | § | |
| | § | VSL |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Defendants Access Industries, Inc., Access Industries Management, LLC, and Access Tubulars, LLC (collectively, the "Access Defendants") move for summary judgment on all of Plaintiff's claims. (Dkt. # 43). Because the Access Defendants have established that there is no genuine issue of material fact regarding whether they owed a duty to Mr. Alford, the court grants the Access Defendants' Motion for Summary Judgment (Dkt. # 43).

Because Mr. Alford has not shown any reason for his lack of diligence in pursuing discovery in the time allotted by this court's Scheduling Order, the court also denies Mr. Alford's Motion to Continue the Access Defendants' Motion for Summary Judgment (Dkt. # 46) and Motion for Continuance and Entry of New Scheduling Order (Dkt. # 65).

Finally, because the court grants summary judgment in favor of the Access Defendants, the court denies as moot the Access Defendants' Motion for Leave to Designate Responsible Third Party (Dkt. # 55) and the Access Defendants' Motion to Exclude the Testimony of Russ Elveston, P.C. (Dkt. # 60).

# BACKGROUND

This lawsuit arises from a workplace accident, in which Plaintiff Douglas Alford's left leg was crushed when a bead grinder machine broke from its foundation and pinned Mr. Alford's leg against a concrete pillar. Mr. Alford began working for Boomerang Tube, LLC, in Liberty, Texas, in November 2012 as a relief operator. Boomerang manufactures pipes, commonly referred to as tubulars, for the oil and gas industry.

At Boomerang, the pipe manufacturing process begins with the entry operator and ends with the cutoff operator, similar to an assembly line. First, the entry operator loads steel coils and feeds them into the un-coiler machine. Second, the pipe goes to the flattener, which flattens the steel to prevent it from coiling back up. Then, the steel goes to the end welder, which welds the end of one piece of steel to the beginning of the next piece of the steel. A copper bar supports the two steel pieces as they are welded together. The steel then goes to the bead grinder, which grinds the weld to smooth the weld seam, producing a flat surface. Next, the steel goes to the accumulator, which holds the steel until it enters the mill weld machine, which melds the steel down the center of the seam. The process ends at the cutoff machine, which cuts the steel to designated lengths.

On September 30, 2013, the date of the accident, Mr. Alford was working as a mill lead, operating the end welder. After Mr. Alford made the weld at the end welder machine, he inspected the weld. On previous occasions, Mr. Alford had seen the copper bar become stuck to the weld on the steel, and he had been forced to use pry bars to pry the copper bar from the steel. The Boomerang incident report from the accident in question indicates that the copper bar used to support the steel sections had stuck to the weld. However, Mr. Alford stated in his deposition that he does not recall whether the copper bar stuck to the weld the day of the accident.

After inspecting the weld, Mr. Alford used a control panel to feed the steel forward through the bead grinder where he intended to spray paint the location of the weld. He stood near the bead grinder, holding the spray paint in his left hand and working the console with his right hand, with his left leg positioned between the bead grinder and a concrete pillar. The copper bar struck the bead grinder, pushing the bead grinder forward and pinning Plaintiff's leg between the bead grinder and the concrete pillar.

Mr. Alford alleges that Boomerang is a wholly owned subsidiary controlled operationally and financially by Access Industries, Inc., through sham companies, alter ego entities, and de facto partnerships. Mr. Alford also alleges that Boomerang's board of directors is stacked with a majority of Access Industries, Inc. employees who have to approve even minor capital expenditures for Boomerang's Liberty facility.

Access Industries, Inc. is a privately held industrial group headquartered in New York City. Access Industries Management, LLC is the manager of Access Tubulars, LLC. Access Tubulars, LLC is an investor in Boomerang.[1] In December 2010, Boomerang and Access Tubulars, LLC entered into a Management Consulting Agreement ("MCA"). The MCA provides that Access Tubulars, LLC, or its affiliates, will provide certain "consulting and management advisory services" to Boomerang. MCA, Dkt. # 43-5, at p. 4.

None of the Access Defendants own the property where the accident occurred or maintain an office at Boomerang's facility. Mr. Alford is not employed by the Access Defendants. Boomerang carried workers' compensation insurance that was in effect on the date

---

[1] Access Tubulars, LLC was an investor in Boomerang Tube, LLC as of September 30, 2013, the date of the accident.

of the accident.  Mr. Alford received, and continues to receive, workers' compensation payments through Boomerang.

Mr. Alford sues the Access Defendants for negligence and negligent undertaking[2] under alter ego, sham company, and joint enterprise derivative liability theories and seeks damages for physical pain and suffering, physical disfigurement, physical impairment, mental anguish, loss of opportunity, loss of enjoyment of life, medical expenses, loss of earning capacity, and exemplary damages.[3]

First, the Access Defendants assert that they are entitled to summary judgment on Mr. Alford's negligence and negligent undertaking claims, arguing that they owed no duty to Mr. Alford because they exercised no control over the operation of the pipe manufacturing process at Boomerang.  Second, the Access Defendants argue that they cannot be liable under a derivative liability theory because Boomerang has no underlying liability for which the Access Defendants could be accountable, as Mr. Alford's exclusive claim against Boomerang is workers' compensation.

---

[2] The negligent undertaking claim is labeled as "Assumption of Duty Liability" in Plaintiff's State Court Petition.  (Dkt. # 1-3, at p. 8).

[3] Mr. Alford also sued Kent Industrial (USA), Inc. for negligence and products liability. Upon an agreed motion of Kent Industrial and Mr. Alford, the court dismissed Mr. Alford's claims against Kent Industrial with prejudice.  (Dkt. ## 39, 40).

Mr. Alford also sued Steve Chason, the Safety Coordinator charged with training employees and developing safety policies and procedures at Boomerang, and Ken Long, an employee in Boomerang's upper management.  Mr. Chason and Mr. Long were dismissed as improperly joined in the court's Order Denying Remand.  (Dkt. # 18).  The Access Defendants are the only remaining defendants in this case.

## II. DISCUSSION

**A.      The Access Defendants' Motion for Summary Judgment**

A motion for summary judgment should be granted when, after considering the materials in the record, including pleadings, discovery, and affidavits, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of demonstrating that no material fact issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the moving party meets this burden, then the non-moving party must set out affirmative evidence to defeat the summary judgment motion. *Id.* at 257.

Only a genuine dispute over a material fact—a fact that might affect the outcome of the suit under the governing substantive law—will preclude summary judgment. *Id.* at 248. The dispute is genuine if the evidence is such that a fact-finder, utilizing the proper evidentiary standard, could render a decision in the non-moving party's favor. *See id.* at 255. In determining whether there is a genuine issue for trial, the court must view all facts and the inferences to be drawn from them in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, only reasonable inferences in favor of the nonmoving party can be drawn from the evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992).

**1.      Mr. Alford's Negligence Claim**

Mr. Alford alleges that the Access Defendants, through sham companies, alter ego entities, and a de facto partnership with Boomerang, were negligent in one or more of the following ways: (1) failing to provide a reasonably safe workplace; (2) failing to exercise reasonable care to secure the safety of Mr. Alford during his employment; (3) failing to enforce

or implement safety regulations promulgated by the Occupational Safety and Health Administration for the protection of Boomerang employees; (4) failing to have adequate policies and procedures to ensure worker safety while working around unguarded machines; (5) failing to adequately make repairs or perform necessary maintenance to machinery used by Boomerang and its employees; (6) failing to use ordinary care in providing Boomerang and its employees adequate help in the performance of their work by providing properly trained supervisors; (7) failing to prevent Boomerang and its employees from causing an unreasonable risk of harm to other employees; (8) failing to adequately supervise employees at Boomerang; (9) failing to properly train employees and supervisors at Boomerang; (10) failing to remedy known hazards around plant machinery; (11) failing to warn Mr. Alford of the dangerous condition of the surface grinding machinery; and (12) failing to exercise reasonable care to avoid injury to Boomerang employees.  Pl. Compl., Dkt. # 1-3, at p. 6–7, ¶ 20.

"As a general rule, a parent corporation is not liable for the torts of its subsidiaries." *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 350 (Tex. App.—Beaumont 2010, writ denied) (citing *Lucas v. Tex. Indus.*, 696 S.W.2d 372, 374 (Tex. 1984)).  A corporation is not liable for the torts of its subsidiaries "merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of control that stockownership gives to stockholders." *Seminole Pipeline v. Broad Leaf Partners*, 979 S.W.2d 730, 739 (Tex. App. —Houston [14th Dist.] 1998, no writ).  There must be more than mere unity of financial interest, ownership, and control before a parent is held liable for the subsidiary's tort. *Id.* (citing *Lucas*, 696 S.W.2d at 374).  "In short, absent a showing of wrongdoing on the part of the parent corporation, Texas courts have refused to make the parent liable for its subsidiary's

torts." *Seminole Pipeline*, 979 S.W.2d at 739 (citing *Lubrizol v. Cardinal Constr.*, 868 F.2d 767, 771 (5th Cir. 1989)).

"To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach." *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)). Whether a duty exists is a threshold inquiry and a question of law for the court to decide from the particular facts of the case. *Kroger Co.*, 197 S.W.3d at 794; *Cleveland Reg'l Med. Ctr., L.P.*, 323 S.W.3d at 350.

"The Texas Supreme Court has held that in cases where a plaintiff alleges negligence in maintaining a safe workplace, the plaintiff must show that the party it asserts had a duty to provide a safe workplace had actual control or a right of control over the *specific* aspect of the safety and security of the premises that led to the plaintiff's injury." *Morris v. Scotsman Indus.*, 106 S.W.3d 751, 754 (Tex. App.—Fort Worth 2003, no writ) (emphasis in original) (citing *Exxon Corp.*, 867 S.W.2d at 23; *Brooks v. Nat'l Convenience Stores, Inc.*, 897 S.W.2d 898, 902–903 (Tex. App.—San Antonio 1995, pet. denied)); *see also Coastal Corp. v. Torres*, 133 S.W.3d 776, 778 (Tex. App.—Corpus Christi-Edinburg 2004, writ denied) (stating that it is apparent that liability is imposed on a parent corporation for a subsidiary's tort when it is apparent that the parent corporation has specific control over the activity that caused the workplace accident on the subsidiary's premises). Only parent corporations that have the right to control workplace safety of the subsidiary, through a contractual agreement that explicitly assigns the parent the right to control safety in the workplace, or that actually exercise control over workplace safety, have a duty to the workers to maintain a safe workplace. *Morris*, 106 S.W.3d at 754 (citing *Exxon*, 867 S.W.2d at 23; *Brooks*, 897 S.W.2d at 903); *see also Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). A right of control over operations of the subsidiary *in general* is

not sufficient to hold a parent corporation liable for torts of the subsidiary. *See Coastal Corp.*, 133 S.W.3d at 779 (citing *Exxon Corp.* 867 S.W.2d at 22–23).

### a.      No Contractual Control

Mr. Alford alleges the following regarding the existence of a contract creating a right to control:

> Access Industries, Inc., as an affiliate of Access Tubulars, LLC and Access Industries Management, LLC, entered into an express agreement to provide financial, managerial, operational and other advice without limitation to Boomerang and thus exercised control over Boomerang.

Pl. Compl., Dkt. # 1-3, at ¶ 19.  The agreement Mr. Alford references is the Management and Consulting Agreement ("MCA"), and the key provision in dispute is Section 3 of the MCA.  But, as in any contract dispute, the court interprets the meaning of the contract by examining the language of the contract itself, rather than the way the language is paraphrased in motions and briefs.  *See, e.g.*, *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

The opening paragraph of Section 3 of the MCA states:

> 3.      Services.   Access hereby agrees that during the term of this Agreement, Access or its Affiliates will provide the following consulting and management advisory services (the "Services") to Boomerang . . .

MCA, Dkt. # 43-5, at p. 4.  The lettered subsections of Section 3 describe with more particularity the "consulting and management advisory services" that Access is to provide under the MCA.

The remaining subparagraphs of Section 3 of the MCA provide:

(a)     advice in connection with the negotiation and consummation of agreements, contracts, documents and instruments necessary to provide Boomerang from time to time with third party financing on terms and conditions satisfactory to Boomerang;

(b)     financial, managerial and operational advice in connection with the operations of Boomerang, including, without limitation, advice with respect to the development and implementation of strategies for improving the operating and financial performance of Boomerang;

(c)     strategic advice in connection with strategic alternatives available to Boomerang, such as asset acquisitions and sales, mergers, acquisitions, consolidations, reorganizations, recapitalizations and restructurings; and

(d)     such other services as may be requested in writing by Boomerang and agreed to by Access.

MCA, Dkt. # 43-5, at p. 4–5.

A careful reading of the subsections of Section 3 discloses no language pertaining to any obligation, duty, or even authority, to control or interfere with day to day supervision of employees at the Boomerang plant. There is no requirement that Access must analyze or direct the way each machine, or any machine, is to be used or safeguarded, or to provide safety standards or operating procedures for any of the tasks in which Mr. Alford was engaged on the day he was injured.

Subsection 3(a) delineates provision of "consulting and management advisory services" as "advice in connection with the negotiation and consummation of agreements, contracts, documents, and instruments . . . ." Subsection 3(c) speaks to "strategic advice" on topics such as sales, mergers, and reorganizations. These two subsections have nothing to do with a grant of control over line operations, safety measures, or supervision of employees.

While subsection 3(b) does contain the word "operational," the root of which is "operation," this is of no avail to Mr. Alford. The consulting and management advisory services described in 3(b) are "financial, managerial, and operational advice in connection with the operations of Boomerang, including, without limitation, advice with respect to the development and implementation of strategies . . . ." However, contract language must be read as a whole, and a word in a phrase is interpreted in the context of that phrase. *Burlington N. & Santa Fe Ry. v. S. Plains Switching, Ltd.*, 174 S.W.3d 348, 356 (Tex. App.—Fort Worth 2005, no pet.) ("[I]ndividual words, phrases, or clauses should not be isolated and read out of context, but rather the document should be read as a whole to determine the intentions of the parties as expressed in the writing.") (citing *State Farm Life Ins. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995)). When read in the context of the entire MCA, "financial, managerial, and operational advice in connection with the operations of Boomerang," refers to the overall management of Boomerang, rather than the operation of individual machines, assembly lines, or daily work tasks.

The MCA does not provide the Access Defendants with the right or duty to control the safety of any machine at Boomerang, let alone the specific safety defects in the bead grinder machine that led to Mr. Alford's injury. Access has no right or duty to control the procedures used during the tubular manufacturing process, and certainly has no control over how an employee like Mr. Alford uses the bead grinder machine. *See Parham v. Ryder Sys., Inc.*, No. 3:13-CV-923-B, 2014 WL 113600, at *6 (N.D. Tex. Jan. 12, 2014) ("A court does not infer duty from a right to control the general operation of the workplace, but instead should consider whether the purported employer had the right to control the specific safety defects that led to the plaintiff's injury.") (citing *Exxon*, 867 S.W.2d at 23; *Morris*, 106 S.W.3d at 754); *cf. Dow Chem.*

*Co. v. Bright*, 89 S.W.3d 602, 611 (Tex. 2002) (noting that mere promulgation of safety polices does not establish actual control over independent contractor).

Because the MCA does not give the Access Defendants a right or duty to control the working practices and methods of Boomerang's employees, the day to day operation of the tubular manufacturing process as a whole, or the bead grinder machine in question or any defects in the bead grinder machine, the Access Defendants did not have explicit contractual control over the injury-producing event in this case. As a matter of law, the MCA did not create a duty of the Access Defendants to ensure a safe tubular manufacturing process for any Boomerang employee.

### b. No Actual Exercise of Control

Mr. Alford alleges the following regarding actual exercise of control:

> Boomerang is a wholly owned subsidiary controlled operationally and financially by Defendant Access Industries, Inc. through sham companies, alter ego entities and de facto partnerships. Boomerang's board of directors is stacked with a majority of Access Industries, Inc. employees who have to approve even the minimalist of capital expenditures for Boomerang's pipe and tube manufacturing facility. Access Industries, Inc.'s right to control and actual control over the Boomerang facility, via its sham companies Access Tubulars, LLC and Access Industries Management, LLC, resulted in an assumption by Access Industries, Inc. of duties owed to Alford. Access Industries, Inc. also provided operational advice and managerial advice to Boomerang with an agreement to share in the losses and profits of production from the Liberty, Texas facility.

Pl. Compl., Dkt. # 1-3, at p. 5-6, ¶ 18. Just like the theories underlying a contractual right to control, to hold a parent corporation liable for exercising actual control over a subsidiary, the control must be over the injury-producing event. *See, e.g.*, *Dow Chem. Co.*, 89 S.W.3d at 607; *Lee Lewis Constr., Inc.*, 70 S.W.3d at 783–784.

In support of their arguments that they have exercised no actual control over the injury-producing event at Boomerang, the Access Defendants offer the affidavit of Alejandro Moreno,

General Counsel and Executive Vice President of Access Industries, Inc. Moreno Aff., Dkt. # 43-5, at p. 1. In relevant part, Mr. Moreno states:

> Since Boomerang Tube, LLC's operations began at the Boomerang Facility, including on September 30, 2013, the Access Entities have not directed the manufacturing process for the tubular products produced by Boomerang Tube, LLC, including the manner in which the tubulars are fabricated or how the various machines involved in the manufacturing process are used. The Access Entities have not directed Boomerang Tube, LLC or its employees on how to operate the machines involved in the manufacturing process or where the employees should position themselves in relation to the machines. Specifically, the Access Entities have not directed Boomerang Tube, LLC employees how to operate the End Welder machine or the Bead Grinder machine, including where to stand while using those machines or how to inspect or mark the welds produced by the End Welder. The Access Entities have not been involved in identifying hazards associated with using the machines involved in the manufacturing process, including pinch points and the placement of barricades or rails in the Boomerang Facility. The Access Entities have not been involved with inspecting, maintaining, or repairing the machines used in the manufacturing process, including the End Welder and the Bead Grinder. The Access Entities have not provided training to Boomerang Tube, LLC employees regarding how to operate the machines involved in the manufacturing process, including the End Welder and the Bead Grinder.
>
> On September 30, 2013, the Access Industries did not provide any work instructions to Douglas Alford. The Access Industries did not direct Mr. Alford how to operate the End Welder machine or the Bead Grinder machine, including where to stand while using those machines or how to inspect or mark the welds produced by the End Welder.

Moreno Aff., Dkt. # 43-5, at p. 2–3, ¶¶ 6–7.

The Access Defendants also offer the deposition of Plaintiff, Mr. Alford, in which he explains that he was trained by Boomerang employees Norman Hebert and Jeff Carter. Alford Depo., Dkt. # 43-6, at p. 12–13. Mr. Alford testified that he did not know who the Access Defendants were and had no understanding of how the Access Defendants were connected to the Boomerang facility. Alford Depo., Dkt. # 43-6, at p. 30. Mr. Alford further testified that he received work instructions from Boomerang employees and not the Access Defendants; in fact,

Mr. Alford confirmed that he had never had any communications, either in writing or verbally, with anyone who he understood worked for one of the Access Defendants. Alford Depo., Dkt. # 43-6, at p. 31. Mr. Moreno's affidavit and Mr. Alford's deposition support that the Access Defendants did not exercise actual control over the equipment that injured Mr. Alford at the Boomerang facility.

In response, Mr. Alford argues that because Access Defendants own a controlling interest in Boomerang, they exercised actual control over the Boomerang facility. This argument is misplaced. As discussed above, a corporation is not liable for the torts of its subsidiaries "merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of control that stockownership gives to stockholders," or mere unity of financial interest or ownership. *Seminole Pipeline*, 979 S.W.2d at 739 (citing *Lucas*, 696 S.W.2d at 374).

Mr. Alford also argues that the Access Defendants exercised control over the specific equipment that injured him because (1) the Access Defendants were responsible for building, renovating, and expanding the Boomerang facility, including acquiring the bead grinder, (2) the Boomerang facility would not have had the bead grinder installed but for the Access Defendants, (3) the Access Defendants had knowledge of ongoing safety issues related to machine-guarding as a result of the 2011 OSHA investigations and citations, (4) OSHA specifically found a lack of funding to be a direct cause of unsafe conditions at the Boomerang facility, (5) the Access-controlled board of Boomerang approved or denied plant purchases, including new machinery and safety equipment, (6) Boomerang relied on the Access Defendants to provide approval and funding for equipment purchases, and (7) the Access Defendants encouraged Boomerang management's dangerous pro-profits policies. None of these arguments establish that the Access Defendants had specific control over the safety of the bead grinder machine or the tubular

manufacturing process that caused Mr. Alford's accident, or that the Access Defendants had any more control over Boomerang than the average parent corporation has over its subsidiary.

Even if these seven averments describe a theory known to Texas law, under which liability might be assigned to the Access Defendants for somehow having some degree of specific control over the bead grinder machine or the tubular manufacturing process that caused Mr. Alford's accident, Mr. Alford has no supporting admissible evidence. *See, e.g.*, *Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

The Access Defendants object to Mr. Alford's use of: a printout of one of Access Industries' webpages (Ex. 2); the deposition of Mr. Alejandro Moreno, which was taken in prior litigation against the Access Defendants (Ex. 3); a February 1, 2010 Press Release (Ex. 4); a *Manufacturing Today* article (Ex. 5); the deposition of Mr. Rick Garza, which was taken in prior litigation against the Access Defendants (Ex. 6); the minutes from a Boomerang Board of Directors meeting (Ex. 7); an OSHA file (Ex. 10); and an OSHA news release (Ex. 11). The Access Defendants object to Mr. Alford's use of these documents as summary judgment evidence, contending that Mr. Alford never produced these documents in his Rule 26(a)(1) disclosures. Mr. Alford concedes that he did not disclose these documents. Rather, Mr. Alford argues that his nondisclosure was harmless because there was no unfair surprise, as these exhibits are print outs from Access's own website, deposition testimony from prior litigation with the Access Defendants, documents previously produced by the Access Defendants in prior litigation, and are all documents that the Access Defendants either created or already had in their possession.

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, if a party fails to provide information required by Rule 26(a), the party is not allowed to use that information as evidence at a hearing, at a trial, or in support of a motion, unless such failure is harmless. Fed. R. Civ. P. 37(c)(1). This rule is reiterated in both this court's Order Governing Proceedings (Dkt. # 2, at p. 4), and this court's Scheduling Order (Dkt. # 21, at p. 4).

The court overrules the Access Defendants' objections to Exhibits 2, 4, and 5 of Mr. Alford's Motion for Summary Judgment, as these are printouts from Access's own website, and there is no unfair surprise to the Access Defendants. However, none of these exhibits support that the Access Defendants owed Mr. Alford a duty under any negligence theory, as they do not establish that the Access Defendants had a contractual right to control or exercised actual control over the safety of the bead grinder machine or the tubular manufacturing process. Exhibit 2 is a print-out from the website of Access Industries which states:

> Access Industries owns a controlling interest in Boomerang Tube, LLC. Boomerang ha recently constructed a new 487,000-square-foot, 120 acre production facility in Liberty, Texas, to produce wielded OCTG and line pipe for customers in the United States and Canada. New, state-of-the-art equipment has the capacity for 400,000 tons of production annually and allows Boomerang to offer a unique array of products.

Dkt. # 45-3, at p. 2. Exhibit 4 is an article on the website of Access Industries, which discusses the construction of Boomerang's Liberty facility. Dkt. # 45-5, at p. 2. Exhibit 5 is an article from *Manufacturing Today*, an internet website, in which Mr. Alford points to the following:

> As Eisenberg further explains, Boomerang Tube was fortunate to have substantial capital funding when it was initially developed. This funding helped the company ride out the proverbial storm of the economic downturn, and it also helped the business acquire high-end equipment to produce specialized products. "We're able to [develop] some unique products when others are not, because of our equipment capabilities," he adds.

Dkt. # 45-6, at p. 1.  As discussed above, neither the fact that the Access Defendants own a controlling interest in Boomerang nor the fact that the Access Defendants financed the construction of Boomerang's Liberty facility is sufficient to establish that Access Industries owed Mr. Alford a duty under any negligence theory. *See, e.g.*, *Seminole Pipeline*, 979 S.W.2d at 739.

The court sustains the Access Defendants' objections to Exhibits 3, 6, 7, 10, and 11 as not timely disclosed.  Mr. Alford does not dispute that he did not disclose these exhibits to Defendants as part of his Rule 26(a)(1) Disclosures.  Discovery in this matter closed on November 27, 2015.  Mr. Alford made no request to supplement his disclosures out of time.[4] Now, Mr. Alford attempts to attach these exhibits as evidence to his Response to the Access Defendants' Motion for Summary Judgment, filed November 30, 2015, a mere two months before pretrial filings were to become due.  Allowing Mr. Alford to introduce these exhibits as evidence at this late stage would be unfairly prejudicial to the Access Defendants, as they would have no opportunity to find evidence to rebuff Mr. Alford's untimely disclosed evidence before trial.

Exhibits 3 and 6 are depositions from prior litigation against the Access Defendants. Assuming arguendo that the court were to find the depositions timely disclosed or otherwise admissible under Rule 37 of the Federal Rules, these depositions do not change the provisions of the MCA and do not establish that the Access Defendants had explicit contractual control or

---

[4] Although Mr. Alford did file a Motion to Continue the Access Defendants' Motion for Summary Judgment (Dkt. # 46), in which Mr. Alford requested additional time to conduct discovery, this request was made three days after the close of discovery, and Mr. Alford offered no reasons as to his lack of diligence in pursuing discovery within the deadlines proscribed by the court.  *See* Dkt. # 46.  The court's denial of Mr. Alford's Motion to Continue the Access Defendants' Motion for Summary Judgment is discussed in more detail below.

actual control over the safety of the bead grinder machine, how Mr. Alford or any other employee was using the bead grinder machine, or any other specifics of the tubular manufacturing process. Exhibit 3 is the deposition of Mr. Alejandro Moreno in prior litigation against the Access Defendants, in which Mr. Moreno discusses the corporate structure of Boomerang and the Access Defendants, the funding that the Access Defendants have provided Boomerang in the past, how the Access Defendants would decide to provide more capital funding to Boomerang, and states that he toured Boomerang's Liberty facility once on a site visit. Exhibit 6 is the deposition of Rick Garza in prior litigation against the Access Defendants, in which Mr. Garza discussed Boomerang's purchasing limit and when Boomerang had to get approval from the Access Defendants for purchases. Neither the deposition of Mr. Moreno nor the deposition of Mr. Garza establishes that the Access Defendants had contractual or actual control over the safety of the bead grinder machine, the safety of the tubular manufacturing process, how Mr. Alford operated the bead grinder machine, or how any other worker operated the machines in the tubular manufacturing process.

Exhibit 7 is the Minutes from various meetings of the Board of Directors of Boomerang. In this exhibit, Mr. Alford highlights discussion of capital spending, discussion of hiring, and discussion of OSHA citations. Mr. Alford also highlights the names of several employees of the Access Defendants who serve as directors on Boomerang's Board of Directors. However, as discussed above, a corporation is not liable for the torts of its subsidiaries merely because of a duplication of some or all of the directors or officers, or unity of financial interest or ownership. *See Seminole Pipeline*, 979 S.W.2d at 739. The fact that some employees of the Access Defendants served on the Board of Directors for Boomerang does not establish that the Access Defendants exercised actual or contractual control over the safety of the bead grinder or the

tubular manufacturing process or instructed Boomerang employees on the safety procedures in that process.

Exhibit 10 is the OSHA citation of Boomerang. Exhibit 11 is the OSHA Regional news Release about Boomerang's OSHA citations. These documents also do not establish that the Access Defendants had actual or contractual control over the safety of the bead grinder machine or the tubular manufacturing process, so they do not establish that the Access Defendants owed any duty to Mr. Alford.

While Mr. Alford does offer his own deposition, the MCA, and the deposition of Kyle Burmaster, which are admissible, none of these controvert the Access Defendants' summary judgment evidence.

Because the Access Defendants have shown that there exists no genuine issue of material fact regarding whether the Access Defendants had the right to control, or exercised actual control over, the safety of the bead grinder machine and the tubular manufacturing process, the court grants the Access Defendants summary judgment on Mr. Alford's negligence claim.

**2.     Mr. Alford's Negligent Undertaking Claim**

Mr. Alford alleges that the Access Defendants assumed responsibility and undertook a duty to provide a safe work environment at Boomerang by exerting a right to control the Boomerang facility by providing operational, financial, and managerial advice to the Boomerang facility, and thus exercising supervisory control and the right to control the operations at Boomerang. Pl. Compl., Dkt. # 1-3, at p. 8–10.

Like a negligence claim, the analysis of a negligent undertaking claim against a parent corporation turns on whether the parent corporation had control over the specific aspect of the safety and security of the premises that led to the plaintiff's injury. *See, e.g., Torres v. Dilley*

*Youth Athletic Ass'n*, No. 04-11-00439-CV, 2012 WL 3205856, at *3 (Tex. App.—San Antonio Aug. 8, 2012). As discussed above, providing operational, financial, and managerial advice to the Boomerang facility, as outlined in the MCA, does not establish that the Access Defendants had the right to control, or control over, the safety and security of the bead grinder machine or specific parts of the manufacturing process that led to Mr. Alford's injury. Moreover, as discussed above, the Access Defendants' summary judgment evidence, which is uncontroverted by Mr. Alford, establishes that there is no genuine issue of material fact whether the Access Defendants had the right to control, or control over, the safety and security of the bead grinding machine or specific parts of the manufacturing process that led to Mr. Alford's injury. The court grants the Access Defendants summary judgment on Mr. Alford's negligent undertaking claim.

### 3.      Mr. Alford's Derivative Liability Claims

Derivative liability exists when a parent company is held liable for the actions of its subsidiary due to the corporation being used "as a sham to perpetuate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Trailways, Inc. v. Clark*, 794 S.W2d 479, 489 (Tex. App.—Corpus Christi 1990, writ denied).

The Access Defendants argue that they cannot be liable under a derivative liability theory because Boomerang has no underlying liability for which the Access Defendants could be accountable.[5] Mr. Alford has made no allegation that Boomerang could be liable for anything other than his injuries received as a Boomerang employer. Under Texas law, Mr. Alford's exclusive claim against Boomerang is workers' compensation, and he has received those

---

[5] Mr. Alford responds that he only asserts derivative liability theories "in order to impute liability from one named Access defendant to another." Pl. Resp., Dkt. # 45, at p. 16, ¶ 38.

benefits. There can be no derivative liability to assign to any of the Access Defendants. Therefore, the court grants summary judgment in favor of the Access Defendants on any derivative liability claims.

**B.      Mr. Alford's Motion to Continue Summary Judgment**

On November 30, 2015, Mr. Alford filed a Motion for Continuance of the Access Defendants' Motion for Summary Judgment, arguing that the Access Defendants' Motion for Summary Judgment is premature because discovery is still ongoing in this case; and (2) Mr. Alford had not had the opportunity to take any Defendant depositions. (Dkt. # 46). Essentially, Mr. Alford is requesting an extension of discovery in hopes that he will still find, at this late stage, a genuine issue of material fact.

Fact discovery closed in this matter on November 27, 2015. *See* Scheduling Order, Dkt. # 21, at p. 2. On December 16, 2015, the Access Defendants responded to Mr. Alford's Motion, and Mr. Alford still had requested no depositions of the Access Defendants. *See* Dkt. # 56, at p. 2. Mr. Alford has given no reason for his lack of diligence in pursuing discovery in this matter. Because Mr. Alford was not diligent in pursuing discovery and has not provided the court with any reason for his lack of diligence, Mr. Alford is not entitled to relief on this motion. *See McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 700 (5th Cir. 2014). The court therefore denies Mr. Alford's Motion to Continue the Access Defendants' Motion for Summary Judgment (Dkt. # 46).

**C.      The Access Defendants' Motion for Leave to Designate Responsible Third Party and Motion to Exclude Testimony of Russ Elveston, P.C.**

The Access Defendants also filed a Motion for Leave to Designate Responsible Third Party (Dkt. # 55) and a Motion to Exclude the Testimony of Russ Elveston, P.C. (Dkt. # 60).

Because the court is granting summary judgment in favor of the Access Defendants, the court need not consider these motions. The court denies these motions (Dkt. ## 55, 60) as moot.

**D.    Mr. Alford's Motion for Continuance and Entry of New Scheduling Order**

Mr. Alford requests a continuance of the trial date and again requests an extension of time to complete discovery. (Dkt. # 65). Mr. Alford again provides no explanation for his lack of diligence in pursuing discovery during the time period for discovery outlined in this case. *See* Scheduling Order, Dkt. # 21. The Access Defendants should not now be deprived of a resolution of this matter due to the unexplained lack of diligence of Mr. Alford's counsel. The court denies Mr. Alford's Motion for Continuance and Entry of New Scheduling Order (Dkt. # 65).

**CONCLUSION**

IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 43) is GRANTED, Plaintiff's Motion to Continue Defendants' Motion for Summary Judgment (Dkt. # 46) is DENIED, Plaintiff's Motion for Continuance and Entry of New Scheduling Order (Dkt. # 65) is DENIED, Defendants' Motion for Leave to Designate Responsible Third Party (Dkt. # 55) is DENIED AS MOOT, and Defendants' Motion to Exclude the Testimony of Russ Elveston, P.C. (Dkt. # 60) is DENIED AS MOOT.

So **ORDERED** and **SIGNED** this **8**  day of **February, 2016.**

_____
Ron Clark, United States District Judge